[relates to Docket Item 64]

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SIDNEY J. ELLIS, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 04-4332 (JBS) |
| v. | : | |
| SIEMENS ENTERPRISE NETWORK, INC., | : | **OPINION** |
| Defendant. | : | |

APPEARANCES:

Mario A. Iavicoli, Esq.
43 Kings Highway West
Haddonfield, NJ 08033
    Attorney for Plaintiff

Jason Richard Schmitz, Esq.
Littleton, Joyce, Ughetta, Park & Kelly, LLP
125 Half Mile Road
Suite 200
Red Bank, NJ 07701
    Attorney for Defendant

**SIMANDLE**, District Judge:

This case arises out of injuries that Plaintiff suffered while working as a corrections officer at a state-run correctional facility.  Plaintiff alleges that the alarm system at the facility, which was installed by Defendant Siemens Enterprise Network, Inc. ("Siemens"), malfunctioned and produced a false alarm, and that he was injured when responding to the alarm.  Plaintiff's suit against Siemens asserts claims premised upon negligence and product liability.

Presently before the Court is Defendant's motion for summary judgment [Docket Item 64] as to all of Plaintiff's claims.  For the reasons explained below, the Court will grant Defendant's motion for summary judgment as to Plaintiff's claim for negligent maintenance and his product liability claim (Counts One and Four), but will deny Defendant's motion as to the remaining claims.

**I.    BACKGROUND**

**A.    The August 2, 2002 Accident**

Plaintiff Sidney J. Ellis filed the instant lawsuit to recover damages for injuries he allegedly sustained when the alarm system at the Albert C. Wagner Youth Correctional Facility (the "Wagner Facility") malfunctioned.  (Compl. ¶ 13.)  At the time of the events that precipitated Plaintiff's suit, Plaintiff worked as a corrections officer at the Wagner Facility.  (Id. at ¶ 9.)  On August 2, 2002, Plaintiff was on duty, scheduled to work the "first shift" from 6:00 a.m. to 2:00 p.m.  (Id.)  At approximately 8:57 a.m. on the morning of August 2, 2002, the Wagner Facility's "Emergency Red Phone" system (the "ERP system") sounded its alarm.  (Id. at ¶ 10.)

The ERP system was an alarm system designed to alert the Wagner Facility's staff of security emergencies at the facility. (Schmitz Cert. Ex. H 6.)  The system consisted of red telephones installed throughout the Wagner Facility that Wagner staff could

2

activate by lifting any of the telephone receivers from its base.
(Id.)  When activated, an alarm would sound throughout the
facility, which would alert Wagner's staff that they were in
"lock-down mode."  (Id.)  The alert to enter lock-down mode would
trigger a series of events: prisoners would be locked in their
cells, cell tiers would be locked, and, most importantly for this
case, corrections officers would dispatch to the site of the
activated alarm to respond to the emergency.  (Id. at 6-7.)  When
the alarm sounded on the morning of August 2, 2002, Plaintiff
rushed to the site of the alarm, and while en route, he collided
with another corrections officer who was coming from a different
direction.  (Schmitz Cert. Ex. A. ¶ 12.)  Plaintiff alleges that
he sustained serious injuries as a result of this collision.
(Id. at ¶ 13.)

According to Plaintiff, after the accident, he discovered
that the August 2, 2002 alarm was triggered not to warn of an
actual emergency, but as the result of an alleged malfunction in
the ERP system, the fault for which he attributes to Siemens.
(Id. at ¶ 14.)  According to Plaintiff, the ERP system had
malfunctioned "numerous times" before the August 2, 2002 false
alarm that led to Plaintiff's injuries, including multiple
malfunctions during the year preceding his accident.  (Id. at ¶¶
15-16.)  Plaintiff filed suit against Siemens, alleging that
Siemens was negligent in designing, manufacturing, installing,

3

and/or repairing the ERP system, and that Siemens should be strictly liable for the injuries resulting from its defective product.  (Id. at ¶¶ 1-22.)

**B.    The ERP System**

The Wagner Facility's ERP system predated Siemens' work at the facility, but in 1999 it was determined that the system needed to be upgraded in order to ensure that it would be "Y2K-compliant."  (DelCastillo Dep. at 127.)  In two contracts between Siemens and the New Jersey Department of Corrections ("NJDOC"), dated February 24, 1999 and October 14, 1999, Siemens agreed to upgrade various components of the Wagner Facility's ERP system, as well as to provide and install a variety of telecommunications software and equipment related to the alarm system.  (Schmitz Cert. Exs. D, E.)  The equipment that Siemens provided in upgrading the ERP system included an alarm notification console and a private branch exchange, and these pieces of equipment were connected to each other and to other components of the phone system through Siemens-provided fiber optic "TOSLINK" cable. (Schmitz Cert. Ex. D at 3.)  The existing equipment that Siemens did not replace as part of its upgrade included a main distribution frame and multiple intermediate distribution frames. (Id.)  Additionally, under the parties' agreement, Siemens was not asked to replace the existing system of "house" cabling at the facility.  (Barbo Cert. ¶ 7.)

4

Siemens and the NJDOC also signed a contract for telecommunications systems maintenance services in September, 2000.  (Schmitz Cert. Ex. F.)  Under the terms of the maintenance contract, Siemens agreed to provide support services for the specific products it installed at the Wagner Facility.  (<u>Id.</u> at 2.)  The contract expressly provided that specific types of maintenance work were outside the scope of Siemens' contractual obligations, but were available at an additional charge.  (<u>Id.</u> at 5.)  These services included problems related to "acts of war, lightning, water, fire and other perils"; "corrosive atmosphere . . . or humidity control failure"; "[s]ervice calls necessitated by products not serviced by Siemens"; and "[a]ny cause other than your ordinary and proper use of the Products."  (<u>Id.</u>)

The ERP system's history of false alarms predated Siemens' work at the Wagner Facility.  (Kelly Cert. Ex. C.)  In the year prior to Siemens' work on the ERP system, the prison's "log book" recorded the occurrence of five ERP false alarms.  (<u>Id.</u> at 2-3.)  According to the log book, the incidence of false alarms tapered off after Siemens' initial work – with only two false alarms occurring in 2000, the year following the installation of Siemens' equipment, four false alarms in 2001, and two false alarms in 2002.  (<u>Id.</u> at 2-26.)  In contrast with the data contained in the prison log book, Plaintiff asserts in an affidavit that "[p]rior to when Siemens first worked on the

Emergency Red Phone System, false alarms in the system rarely occurred," but that "[r]epeated false alarms began to occur after the initial work that Siemens did on the . . . [system]." (Ellis Aff. ¶¶ 5-6) (emphasis omitted).  According to Plaintiff, the false alarms would occur "maybe once a month or twice a month for maybe a couple of months, and then the system . . . [would seem] like it's working, and then maybe two or three months later you run into the same problem again . . ."  (Ellis Dep. at 65.)

In addition to generating false alarms, the ERP system would at times cease working altogether.  (Brophy Dep. 14.)  According to Patrick Brophy, who served as Chief of Custody Operations at the Wagner Facility from 1997 to 2002, the facility was old and had a leaky roof, and when water would leak onto the cabling or the telecommunications equipment, it would lead the ERP system to malfunction.  (Id. at 12.)  On July 2, 2001, Mr. Brophy wrote a letter to Julio DelCastillo, a telecommunications analyst for the NJDOP, that described the problems the Wagner Facility was experiencing with the ERP system.  (Schmitz Cert. Ex. G.)  The letter stated that "as a result of moisture in various areas of the cabling system," the ERP system "has degenerated to the point where the phone repair contractor has stated that there are no further repairs that can be done until the wiring is recabled." (Id.)  The damaged institutional cabling was replaced in 2003. (Barbo Cert. ¶ 11.)

C.    **Expert Reports**

On August 18, 2006, Defendant moved for summary judgment on account of Plaintiff's failure to file an expert report that could link the false alarm that led to Plaintiff's injury to Siemens' products or services.  In its February 7, 2007 Order [Docket Item 36], the Court agreed that Plaintiff had to present such expert testimony in order to prove his case, but denied Defendant's motion without prejudice, affording Plaintiff the opportunity to file an expert report.  The Court found that Plaintiff could not proceed on either a negligence or product liability theory without expert testimony:

> Under New Jersey law, expert testimony is required to establish a proposition that is beyond the understanding of an average juror, and the need for such reports in complex products liability cases is well established. See Sanzari v. Rosenfeld, 34 N.J. 128 (1961); Sparrow v. LaCachet, 305 N.J. Super. 301, 304-05 (App. Div. 1997). Indeed, expert testimony is necessary when the product is a "complex instrumentality" because the fact-finder needs assistance in understanding its technical intricacies and in excluding other possible causes of the occurrence. Rocco v. N.J. Transit Rail Operations, 330 N.J. Super. 320, 341 (App. Div. 2000).

[Docket Item 36].  Both parties subsequently submitted brief reports in the form of letters from engineering experts [Docket Items 44 and 51].

1.   Plaintiff's Expert

Plaintiff filed a report from Dr. John M. Tobias, an electrical engineering consultant with a Ph.D. in electrical engineering who has been licensed as an engineer since 1997.  Dr.

7

Tobias based his conclusions on a review of documents pertaining to Siemens' work at the Wagner Facility – including work orders, contracts, documented engineering standards – as well as an inspection of the "equipment, as presently installed" at the facility. (Docket Item 44 at 2.)  Dr. Tobias reached several relevant conclusions regarding Siemens' work on the alarm system at the Wagner Facility.

First, Dr. Tobias concludes that "Siemens did not meet the contractually specified engineering standards, TIA-569 and NEC[,] in the installation of their equipment provided under the contract." (Id. at 3.)  According to Dr. Tobias, section 5.5.5 of the Telecommunication Industry Association Standard 569 ("TIA-569") "requires that the installation space exclude water or drain piping not used directly in support of the equipment."[1] (Id.)  Dr. Tobias concludes that two pieces of equipment supplied and installed by Siemens – the Tradeboard-LCD and TOSLINK fiber – were installed in locations prone to heat and moisture, which

---

[1]  Plaintiff submitted section 5.5.5 of TIA-569 under Docket Item 80.  The section provides in full:

> Where possible, the access provider and service provider spaces should not be located below water level unless preventive measures against water infiltration are employed.  The space shall be free of water or drain pipes not directly required in support of the equipment within the space.  A floor drain shall be provided within the space where risk of water ingress exists.

[Docket Item 80].

8

would mean that Siemens' installation was noncompliant with TIA-569.  (Id.)  Dr. Tobias states that Siemens is responsible for this noncompliance because in its role as the contractor, it "controlled where the equipment was installed."  (Id. at 4.)  In his report, Dr. Tobias also states that Siemens' installation violated the National Fire Protection Association's National Electric Code ("NEC"), Articles 800.18 and 110.3(B),[2] because the Tradeboard-LCD and TOSLINK fiber "were not rated for wet environments."  (Id.)  Dr. Tobias concludes that "violation of required engineering standards in the Siemens equipment installation caused the alarm system to behave erratically, annunciating false alarms or by becoming inoperative."  (Id. at 5.)

    Additionally, Dr. Tobias found no evidence that Siemens conducted an "engineering pre-inspection . . . before the proposal was formulated."  (Id. at 4.)  According to Dr. Tobias, an inspection of the premises prior to Siemens' installation of its equipment would have revealed the inadequacy of the "existing wiring backbone," which would have led a reasonable contractor in Siemens' position to design its system in such a manner so as not to depend on the existing wiring, which ensured that the system "would not operate as expected."  (Id.)  After the Siemens

_____

    [2]  NEC Article 113(B) states in full: "Listed or labeled equipment shall be installed and used in accordance with any instructions in the listing or labeling" [Docket Item 80].

9

equipment was installed on the inadequate legacy equipment, Dr. Tobias notes that Siemens conducted "thirteen months of ineffective patchwork piecemeal repairs" without adequately informing the State that the existing cabling system was insufficient to support Siemens' equipment.  (Id.)

     In his deposition testimony, Dr. Tobias acknowledged that he had not identified a specific defect in a particular piece of Siemens-provided equipment.  (Tobias Dep. 65.)  He conceded, for example, that it was "improbable" that a failing in the TOSLINK cable resulted in the false alarm that caused Plaintiff's injury.[3]  (Id. at 111.)

-----

     [3]  In a supplemental report, Dr. Tobias appears to contradict his deposition testimony regarding the probability of whether the TOSLINK cable itself could have caused the false alarm that resulted in Plaintiff's injury.  (Docket Item 82.)  To the extent that this new submission "contradict[s] his own prior testimony" on the issue of the TOSLINK cable, the Court will not consider the supplemental report when determining whether there exists a genuine issue of material fact on any of Plaintiff's claims.  Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988); see also Jiminez v. All American Rathskeller, Inc., 503 F.3d 247 (3d Cir. 2007).
     Additionally, in his supplemental report, Dr. Tobias introduced a new theory of how Siemens' equipment could have caused Plaintiff's injuries, arguing that the "noise sensitivity" of the equipment rendered it unsuitable to the Wagner Facility. In its November 29, 2007 letter to the parties, the Court agreed with Defendant that it would be inequitable to permit Plaintiff to continue to submit new formulations of his expert's theories up until the eve of the hearing on the motion for summary judgment, and informed the parties that it would not consider those portions of Dr. Tobias' late submission containing new theories of causation.  More than a year earlier, as noted above, the Court had extended to Plaintiff an extraordinary opportunity to reopen discovery in the face of Defendant's then-pending summary judgment motion in order to provide the required expert

2.  Defendant's Expert

Defendant filed a report from its expert, Mr. James
Crabtree, who is a licensed engineer.  (Docket Item 51.)  Mr.
Crabtree's report draws numerous conclusions that contradict Dr.
Tobias' findings.  First, Mr. Crabtree argues that Siemens was
not "contractually responsible for replacing or insuring that the
existing correctional facility telephone cabling systems were in
compliance with TIA/EIA-569-A," and that Siemens was not involved
with the original alarm system installation and so had "no
practical control over the selected locations in which the new
red emergency telephone equipment was installed."  (Id. at 9.)
In support of these assertions, Mr. Crabtree notes that under the
NEC, the tunnels in which Siemens installed TOSLINK Fiber would
be classified as a "damp," rather than a "dry," environment, and
the rooms in which Siemens installed the Trade Board and PBX were
dry environments.  (Id. at 7.)  According to Mr. Crabtree,
Siemens properly installed environmentally appropriate equipment
in these respective environments: "[f]iber optic cabling is
typically unrated or rated for use in wet environments," and the

---

opinions supporting liability.  It would be inequitable, in
response to a second summary judgment motion after the record was
again closed, to permit a second reopening of Plaintiff's expert
discovery, once again moving the expert opinion target that
Defendant is called upon to rebut.  This is especially true when
Defendant has already adduced its own expert's opinion to address
Plaintiff's first theory in the reopened case, and where
Plaintiff's expert deposition based on his original opinions had
already been completed.

Trade Board and PBX, which are rated for installation in dry environments were so installed.  (Id. at 7-8.)  While Mr. Crabtree concedes that the rooms in which the PBXs were installed "were observed to have steam and/or condensate piping located in the areas above the PBXs," TIA-569, upon which the plaintiff's expert relied, merely provides "considerations for design."  (Id. at 8) (emphasis in original, internal quotations omitted). Moreover, "the new Siemens PBX was a replacement for an existing PBX and, as such, its installation location was pre-described and Siemens did not have control over where the equipment was to be installed."  (Id.)

Mr. Crabtree also concludes that there is no evidence to indicate that Siemens' equipment generated any of the false alarms.  (Id. at 9.)  He states that moisture-related problems with the facility's own cabling could "create an electrical short circuit between telephone wires" that would be capable of generating a false alarm.  (Id. at 4.)  On the other hand, "system problems" with the equipment Siemens installed, such as the branch exchange, Trade Board, or TOSLINK Fiber, could not cause false alarms, but would instead "bring the entire emergency red phone system down."  (Id.)  Because the purported cause of Plaintiff's injury was a false alarm, rather than a system-wide outage, Siemens' equipment could not have been the cause of the injury, according to Mr. Crabtree.  (Id.)

Mr. Crabtree further concludes that the available evidence indicates that Siemens reported problems with the Wagner Facility's cabling to State personnel "in a reasonable and timely manner." (Id. at 9.)  Mr. Crabtree notes that the deposition testimony of Julio Del Castillo and the July 2, 2001 letter from Patrick Brophy to Mr. Del Castillo evidence State personnel's awareness of the problems and risks associated with the facility's cabling and moisture problems.  (Id. at 6-7.)

### D.   Procedural History

Plaintiff filed this action in Camden County Superior Court on July 28, 2004, and Defendant removed the case to this Court pursuant to 28 U.S.C. § 1446(a) [Docket Item 1].  On March 29, 2005, Defendant amended its Answer to assert a third-party claim against the NJDOC [Docket Item 10].  Defendant subsequently filed a stipulation dismissing its Third Party Complaint against the NJDOC, and the State was dismissed from this suit [Docket Item 85].  After the Plaintiff filed the report of Dr. Tobias in support of his claims, Defendant again moved for summary judgment on all counts of the Complaint.  The Court heard oral argument at a hearing convened on December 3, 2007, and reserved decision.

## II.  DISCUSSION

Plaintiff's Complaint alleges four causes of action: one based on a theory of strict product liability and three negligence claims alleging that Siemens negligently designed,

installed, and maintained the ERP system.  Siemens has moved for summary judgment on all of Plaintiff's claims.  The Court addresses Defendant's motion for summary judgment as to Plaintiff's product liability and negligence claims in turn below.

### A.    Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." U.S. v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations omitted).

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

### B.   Product Liability Claim

Defendant argues that it is entitled to summary judgment as to Plaintiff's claim based on strict product liability because Plaintiff has failed to identify a particular Siemens-provided

product that was defectively designed or manufactured.  Plaintiff
opposes Defendant's motion, arguing, without citing a single case
or the New Jersey Product Liability Act ("PLA"),[4] that a claim
based on defects in the design of the alarm system as a whole –
rather than a defective component part – is cognizable under the
PLA.

The Court finds that Defendant is entitled to summary
judgment as to Plaintiff's product liability claim.  Under New
Jersey law, "any claim or action brought by a claimant for harm
caused by a product, irrespective of the theory underlying the
claim, except actions for harm caused by breach of an express
warranty," must be brought pursuant to the PLA, N.J.S.A. 2A:58C-1
et seq.  See, e.g., Potwora ex rel. Gray v. Grip, 319 N.J. Super.
386, 400-01 (App. Div. 1999).  Section 2 of the Act "describes
the sole method of proof" for a product liability action, Tirrell

---

[4] In addition to the fact that Plaintiff's thirty-one page
opposition brief does not cite a single case or statute related
to the issues raised by his claims or Defendant's motion,
Plaintiff likewise fails to include a statement of undisputed
material facts as Rule 56.1, L. Civ. R., plainly requires.
Although Plaintiff's brief includes a "Statement of Facts," this
statement contains almost no citations to the record.  These
serious deficiencies impose considerable burdens upon both
Defendant and the Court.  Nonetheless, the Court has endeavored
to comb the available record that the parties have submitted, as
reflected herein.  Were it not possible to tie Plaintiff's
assertions to the record in many respects, the Court would have
little choice but to suppress the opposition for failure to
comply with L. Civ. R. 56.1 and grant Defendant's motion in its
entirety.

v. Navistar Intern., Inc., 248 N.J. Super. 390, 398 (App. Div.
1991), and provides that:

> A manufacturer or seller of a product shall be liable in
> a product liability action only if the claimant proves by
> a preponderance of the evidence that the product causing
> the harm was not reasonably fit, suitable or safe for its
> intended purpose because it: a. deviated from the design
> specifications, formulae, or performance standards of the
> manufacturer or from otherwise identical units
> manufactured to the same manufacturing specifications or
> formulae, or b. failed to contain adequate warnings or
> instructions, or c. was designed in a defective manner.

N.J.S.A. 2A:58C-2.

In analyzing the defective design prong of the Act, New
Jersey courts have drawn a distinction between product designers,
on the one hand, and service providers, on the other.  See, e.g.,
Potwora, 319 N.J. Super. at 401.  In Ramos v. Silent Hoist and
Crane Co., 607 A.2d 667, 669 (App. Div. 1992), the Appellate
Division addressed whether a defective design action could be
brought under the Product Liability Act where the allegation of
product liability focused not on a specific product created by
the defendant, but on an electrical system that the defendant
installed.  The plaintiff in Ramos argued that the defendant's
decisions about how and where to install elements of the
electrical system to power the capstan on a ship constituted
design decisions that brought his claim within the ambit of PLA.
Id.  The Appellate Division rejected these arguments:

> [W]e determine that Foremost's design of the electrical
> system and its professional choice of where to place the
> controls (when the manufacturer of the capstan had made

17

> no provision for controls on or near the capstan nor
> advised the installer in this respect), is not the same
> as a sale of a defectively designed component part of the
> assembled capstan . . . . Foremost designed and installed
> an electrical system to power the capstan.  It may have
> done so negligently, but it did not . . . provide a
> defective component part.

Id. at 671 (internal citations omitted).

Since Ramos was decided, the New Jersey legislature expanded
the scope of the PLA to include a broader definition of "product
sellers," which it defined to include parties who install
products.[5]  N.J.S.A. 2A:58C-8.  While New Jersey courts have not
addressed the impact of the amendment on Ramos, in Thomas v. Ford
Motor Co., the court held that "the Ramos holding survived the
1995 amendment of the Act."  70 F. Supp. 2d 521, 530 (D.N.J.
1999).  The Thomas court reasoned that

> [r]egardless of whether the 1995 amendment imposes
> liability on product sellers or relieves them from
> liability, the amendment presupposes the existence of a
> defective product . . . . While the 1995 amendment brings
> installers within the ambit of the Product Liability Act
> in instances where installers trade in defective
> products, the amendment to the Act was not adopted to

---

[5]  The amended definition of "product seller" in the PLA
provides in relevant part:

> 'Product seller' means any person who, in the course of
> a business conducted for that purpose: sells;
> distributes; leases; installs; prepares or assembles a
> manufacturer's product according to the manufacturer's
> plan, intention, design, specifications or formulations;
> blends; packages; labels; markets; repairs; maintains or
> otherwise is involved in placing a product in the line of
> commerce.

N.J.S.A. 2A:58C-8.

bring installers within the coverage of the Act for improperly installing properly-functioning products.

Id.; see also Universal Underwriters Ins. Group v. Public Service Elec. & Gas Co., 103 F. Supp. 2d 744, 748 n.7 (D.N.J. 2000).

The analyses of Ramos and Thomas are persuasive and applicable to Plaintiff's product liability claim.  Plaintiff concedes that Dr. Tobias' report and deposition testimony do not identify any defects in any component parts supplied or installed by Siemens, arguing instead that the alarm system as a whole was defectively designed.  This argument may be relevant to Plaintiff's negligence theories, but under Ramos, it is insufficient to withstand Defendant's motion for summary judgment on the product liability claim.  Dr. Tobias' report does not identify a defectively designed or manufactured product, and Plaintiff does not argue otherwise, but instead focuses his claim on the defectively designed "system."  As the court in Ramos held, Siemens may have designed this system "negligently, but it did not . . . provide a defective component part," and Plaintiff's claim against Siemens is thus not cognizable under the Product Liability Act.  Ramos, 607 A.2d at 671; see also Thomas, 70 F. Supp. 2d at 530; Universal Underwriters Ins. Group, 103 F. Supp. 2d at 748 n.7.

Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's product liability claim in Count Four of the Complaint.

19

**C.   Negligence Claims**

Count Two alleges negligent design, Count Three alleges negligent installation, and Count One alleges negligent maintenance of the ERP system  In its motion for summary judgment as to Plaintiff's claims based on common law negligence, Defendant advances two arguments.  First, Defendant argues that Plaintiff has failed to submit evidence from which a reasonable jury could find that his injuries were proximately caused by Defendant's conduct.  Defendant claims that the evidence in the record indicates indisputably that the cause of the false alarms was not any of Siemens' equipment, but was, rather, "water infiltration . . . on a telephone panel which was preexisting 'house' equipment, and was not installed by Siemens." (Barbo Cert. ¶ 6.)  Secondly, with regard to Plaintiff's negligent maintenance claim, Defendant argues that the scope of its duty for repair and maintenance following the 1999 upgrade was defined by its contract with NJDOC, which did not permit it to undertake the large-scale repairs that Plaintiff alleges it was negligent in not performing.  The Court addresses each of these arguments in turn below.

      1.   <u>Evidence of Causation Through Negligent Design and Installation</u>

To prove a cause of action founded upon negligence, a plaintiff must establish four elements: (1) that the defendant owed the plaintiff a duty of care, (2) that this duty was

breached, (3) that the breach of duty proximately caused the plaintiff's injury, and (4) actual damages.  Weinberg v. Dinger, 106 N.J. 469, 484 (1987); Ivins v. Town Tavern, 335 N.J. Super. 188, 194 (App. Div. 2000) ("[p]roof of negligence requires, of course, establishment of a duty of care and breach thereof proximately causing the harm").  While in a negligence action the scope of an alleged tortfeasor's duty is a question of law for the court to decide, id., "the New Jersey courts have demonstrated a strong reluctance to decide issues of common law negligence as a matter of law."  Cordy v. Sherwin Williams Co., 975 F. Supp. 639, 645 (D.N.J. 1997) (citations omitted).  This is particularly true with regard to questions of proximate cause, as to which New Jersey courts have held that except for in cases with "highly extraordinary consequences," questions "of proximate cause are jury questions."  J.S. v. R.T.H., 155 N.J. 330, 351-52 (1998); see also Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2729 ("[a]lthough a motion for summary judgment under Rule 56 may be made in any civil action, it is not commonly interposed, and even less frequently granted, in negligence actions").  Nonetheless, in order to survive summary judgment, the nonmovant may not simply rely on the allegations of negligence and causation in the pleadings, but must come forward with evidence sufficient for a jury to return a verdict in his favor.  See Liberty Lobby, 477 U.S. at 248.

21

In this case, the Court finds that triable questions of fact exist as to whether Plaintiff's injuries were proximately caused by Siemens' negligent installation and/or design of the 1999 ERP system upgrade, and will thus deny Defendant's motion for summary judgment as to Counts Two and Three of the Complaint.  According to Dr. Tobias, Siemens' design decisions and installation work did not comply with engineering standards formulated to keep certain equipment free from moisture, and this noncompliance and the resultant moisture exposure caused the system to repeatedly produce false alarms.  (Docket Item 44 at 3.)  While Dr. Tobias does not argue that a particular defect in Siemens-provided equipment caused the false alarm, his report indicates that even if the malfunction resulted from the Wagner Facility's dilapidated and code-noncompliant "house" cabling, Siemens' pre-installation inspections would have revealed the inadequacy of the "existing wiring backbone" and prompted a reasonable contractor to take steps to ensure that the performance of the new equipment did not hinge on deteriorating and noncompliant legacy cabling and equipment.  (Id. at 4.)  In other words, Dr. Tobias's report indicates that Defendant's decision simply to hook its new equipment up to the Facility's faulty extant system caused the malfunction that led to Plaintiff's injury.  See Aronsohn v. Mandara, 98 N.J. 92, 105 (1984) ("a contractor has a duty to [third parties] . . . to carry out his undertaken work in

a careful and prudent manner, and he may be responsible to third persons for their personal injuries . . . proximately caused by his failure to exercise that care"). As Dr. Tobias explains, the "[n]on-compliance [of the facility's legacy equipment] with engineering standards would have been a strong indicator that the best of equipment, even if it were installed correctly upon the existing wiring backbone, would not operate as expected." (Docket Item 44 at 4.) This evidence of the causal tie between Siemens' design and installation decisions and the ERP system's false alarms raises a question of fact that precludes the entry of summary judgment on Plaintiff's negligent design and installation claims.[6]

The Court recognizes that Siemens was not hired to replace the Wagner Facility's "house" cabling in 1999. (Barbo Cert. ¶ 7.) If, however, the inadequacy of the existing wiring would have been as patently obvious to a reasonable contractor as Dr.

---

[6] It is true, as Defendant argues, that at his deposition, Dr. Tobias conceded that he could not "specifically tie [the TOSLINK cable] to Mr. Ellis' mishap." (Tobias Dep. at 105.) As the Court recognized at note 3, supra, to the extent that Dr. Tobias' supplemental report contradicts this testimony and suggests that the TOSLINK could itself have caused the false alarms, such contradictory evidence in the supplemental report cannot serve to create a genuine issue of material fact to defeat Defendant's summary judgment motion. See Jiminez, 503 F.3d at 247. However, Dr. Tobias' concession as to the absence of defects in the TOSLINK cable does not undermine his conclusion that by installing new equipment on top of the Wagner Facility's obviously faulty and code-noncompliant house wiring, Siemens' negligence proximately caused the ERP system's false alarms.

Tobias indicates, and if connecting new equipment to such a
faulty system would cause the equipment to malfunction, as Dr.
Tobias explains, then in upgrading the ERP system Siemens' duty
"to carry out [its] undertaken work in a careful and prudent
manner" would have required it to do more than simply attach its
equipment to the Wagner Facility's faulty existing wiring.
Aronsohn, 98 N.J. at 105.  There is no evidence in the record
suggesting, for example, that in 1999 Siemens discussed with the
NJDOC the risk that attaching its equipment to code-noncompliant
wiring would lead the new equipment to malfunction.  Indeed, the
deposition testimony of Mr. DelCastillo – who testified that he
"would have expected [Siemens] to provide us with details as to
what needed to be done" with regard to any inadequacies in the
Facility's existing equipment – indicates that no such discussion
took place when the new equipment was installed.  (DelCastillo
Dep. at 149.)

    The causal link between Defendant's allegedly negligent
design and installation and the system's false alarms, as alleged
in Counts Two and Three, is supported by Plaintiff's testimony
concerning the timing of the system's history of malfunctioning.
According to Plaintiff, "[p]rior to when Siemens first worked on
the Emergency Red Phone System, false alarms in the system rarely
occurred."  (Ellis Aff. ¶ 5) (emphasis omitted).  After Siemens
installed its new equipment in 1999, however, "[r]epeated false

24

alarms began to occur." (Id. at ¶ 6) (emphasis omitted).  While
there is evidence in the record that casts doubt upon Plaintiff's
testimony on the timing of the false alarms, it is the jury's
responsibility, not the Court's, to assess the weight of such
inconsistent evidence.[7]  Waldron v. SL Industries, Inc., 56 F.3d
491, 501 (3d Cir. 1995) ("the Supreme Court has made it clear
that self-serving testimony may be utilized by a party at summary
judgment") (citing Celotex, 477 U.S. at 324).

Because factual questions exist as to whether Plaintiff's
injuries were proximately caused by Defendant's negligent design
and installation of the ERP system upgrade, the Court will deny
Defendant's motion for summary judgment as to Counts Two and
Three of the Complaint.

---

[7]  Defendant urges the Court to disregard Plaintiff's
affidavit on this matter, arguing that the affidavit contradicts
his deposition testimony as to the chronology of the false
alarms.  While Defendant is correct that under the sham affidavit
doctrine a party cannot avoid summary judgment by filing an
affidavit that contradicts his earlier deposition testimony,
Martin, 851 F.2d at 706, the Court does not find that Plaintiff's
deposition testimony contradicts his affidavit on the specific
issue of when the escalation in the incidence of false alarms
occurred.  Plaintiff was never asked during his deposition
whether the false alarms happened more frequently after Siemens
performed its upgrade in 1999.  Plaintiff was asked "for how long
a period of time" the false alarms had been sounding prior to his
August 2002 accident, to which Plaintiff merely testified that
the false alarms would take place for a couple of months but
would be resolved for two or three months, and then begin to
sound again.  (Ellis Dep. at 65.)  This testimony is not
inconsistent with the statement in Plaintiff's affidavit that the
false alarms escalated in frequency following Siemens' work in
1999.  Plaintiff's affidavit supplements, but does not
contradict, his deposition testimony.

2.   <u>Negligent Maintenance Claim – Absence of Duty</u>

Defendant argues that it is entitled to summary judgment as to Plaintiff's claim for negligent maintenance in Count One because under the terms of the parties' maintenance contract, it did not have a duty to implement the large-scale changes to the ERP system that Plaintiff alleges it was negligent in having not performed.  For the reasons explained below, the Court agrees with Defendant and will grant its motion for summary judgment as to Plaintiff's negligent maintenance claim.

As the Court noted, <u>supra</u>, in a negligence action, the scope of the defendant's duty is a question of law for the court to decide.  <u>Ivins</u>, 335 N.J. Super. at 194.  The determination of the existence of a duty takes into account a range of factors, including issues of fairness and policy, the foreseeability of injury to others arising from defendant's conduct, "the impact on the public of the imposition of a duty of care," <u>Snyder v. American Ass'n of Blood Banks</u>, 144 N.J. 269, 292 (1996), and "the ability and opportunity [of the defendant] to exercise care." <u>Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Group, Inc.</u>, 135 N.J. 182, 195 (1994).  In the context of a maintenance contract, "the ambit of a maintenance contractor's duty to third persons may be measured by the nature and scope of its contractual undertaking." <u>Rosenberg v. Otis Elevator Co.</u>, 366 N.J. Super. 292, 303 (App. Div. 2004) (citation omitted).

26

The scope of Siemens' contractual undertaking for the maintenance of the equipment it had installed at the Wagner Facility indicates that in its role as maintenance contractor, it did not have "the ability and opportunity to exercise" the care that Plaintiff alleges it should have taken.  <u>Carter Lincoln-Mercury</u>, 135 N.J. at 195.  After the 1999 upgrade was completed, Defendant's responsibility for the ERP system was defined by the terms of the maintenance contract.  (Schmitz Cert. Ex. F.)  Under that contract, Siemens was responsible only for maintaining and repairing the "eligible [p]roducts installed" at the Wagner Facility.[8]  (<u>Id.</u> at 2.)  As Plaintiff has made clear in his submissions in opposition to Defendant's motion, his claims have never been premised upon specific product defects, but the malfunctioning system as a whole; indeed, Dr. Tobias testified that he had uncovered no evidence of a defect in a particular piece of Siemens-provided equipment.  (Tobias Dep. 65.)  Under the terms of the maintenance contract, Siemens had neither the duty nor the authority to undertake systemic repairs, such as replacing or repairing the Facility's "house" cabling system, that Plaintiff argues were necessary in his critique of

_____

[8]  As Mr. DelCastillo testified during his deposition, the scope of Siemens' maintenance duties under its contract was limited to servicing "[t]he Siemens-provided equipment." (DelCastillo Dep. at 141.)

the "ineffective patchwork piecemeal repairs" that Siemens did
perform.[9]  (Docket Item 44 at 4.)

Plaintiff's argument that Siemens was negligent in
performing its maintenance and repair duties because it failed to
warn the NJDOC of the problems with the house cabling prior to
Plaintiff's accident is not supported by the evidence in the
record.  While, as the Court explained supra, Siemens may have
been negligent in failing to so advise the NJDOC when it designed
the upgrade to the ERP system and installed its equipment in
1999, the evidence indicates that by July 2, 2001, NJDOC was
well-advised as to the deteriorated state of the house cabling
and its impact upon the functioning of the ERP system.  On that
date, Mr. Brophy sent a letter to Mr. DelCastillo informing the
NJDOC that "as a result of moisture in various areas of the
cabling system," the ERP system "has degenerated to the point
where the phone repair contractor has stated that there are no
further repairs that can be done until the wiring is recabled."
(Schmitz Cert. Ex. G.)  The NJDOC thus had notice of the

---

[9]  Mr. DelCastillo's testimony on this issue illustrates the
limited reach of Siemens' authority as maintenance contractor:

> Q:   [I]f [a] Siemens technician . . . was there
>      inspecting [the house] cabling on his own,
>      submitted a bill for $8,000, the State wouldn't pay
>      that, correct?
>
> A:   We would probably have a problem with that, yeah.

(DelCastillo Dep. 141-42.)

malfunctioning ERP system and the deteriorated house cabling more than a year before Plaintiff's accident, and at that point, the decision as to whether to repair the house cabling or to undertake similarly systemic repairs was exclusively the NJDOC's to make.  Siemens simply did not have the authority to initiate such an undertaking in its role as maintenance contractor, as the terms of its maintenance contract with the NJDOC make clear.

The Court concludes that Siemens' contractual duty to maintain and repair the equipment it had installed at the Wagner Facility did not carry with it a duty to undertake systemic repairs, such as replacing the Facility's house cabling, that Plaintiff alleges Siemens should have performed.  Under the terms of the maintenance contract, Siemens had neither the authority nor the duty to perform such systemic repairs, but was responsible only for repairing the "eligible [p]roducts [it had] installed" at the Wagner Facility.  (Schmitz Cert. Ex. F at 2.) Finding with regard to Plaintiff's negligent maintenance claim that Siemens did not owe Plaintiff the duty he alleges that they breached, the Court will grant Defendant's motion for summary judgment as to Count One of the Complaint.

## III. CONCLUSION

For the reasons explained above, the Court grants Defendant's motion for summary judgment as to Counts One and Four

of the Complaint and denies the motion as to Counts Two and Three.  The accompanying Order will be entered.


**March 17, 2008**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            United States District Judge